**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHANDA SMITH; ELIZA
THOMPSON, Guardian ad Litem
for Chanda Smith, individually
& on behalf of all other persons
similarly situated; JAVIER MEJIA;
GLORIA MEJIA; QUINN
SULLIVAN; MADO MOST,
    *Plaintiffs-Appellees*,

v.

LOS ANGELES UNIFIED SCHOOL
DISTRICT, a California public
entity; ROY ROMER, in his
official capacity as
Superintendent of the LA
Unified School District,
    *Defendants-Appellees*,

v.

APRIL MUNOZ; JULIA FLORES;
CHERYL AYAPANA; V. P.; A. F.;
M. H.; J. A.,
    *Movants-Appellants.*

No. 14-55224

D.C. No.
2:93-cv-07044-
RSWL-GHK

CHANDA SMITH; ELIZA
THOMPSON, Guardian ad Litem
for Chanda Smith, individually
& on behalf of all other persons
similarly situated; JAVIER
MEJIA; GLORIA MEJIA; QUINN
SULLIVAN; MADO MOST,
　　　　*Plaintiffs-Appellees*,

and

APRIL MUNOZ; JULIA FLORES;
CHERYL AYAPANA; V. P.; A. F.;
M. H.; J. A.,
　　　　*Movants*,

and

MINA LEE; FRANCES MORENO,
　　　　*Movants-Appellants*,

v.

LOS ANGELES UNIFIED SCHOOL
DISTRICT, a California public
entity,
　　　　*Defendant-Appellee*.

No. 14-55256

D.C. No.
2:93-cv-07044-
RSWL-GHK

ORDER AND
AMENDED OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, Senior District Judge, Presiding

Argued and Submitted February 12, 2016
Pasadena, California

Filed May 20, 2016
Amended July 27, 2016

Before: Jerome Farris, Richard R. Clifton,
and Carlos T. Bea, Circuit Judges.

Order;
Opinion by Judge Bea

**SUMMARY**[*]

**Intervention**

The panel reversed the district court's denial of appellants' motion to intervene in a class action brought on behalf of all disabled students in the Los Angeles Unified School District.

Appellants are a sub-class of moderately to severely disabled children. They sought to intervene to challenge a new policy, adopted by LAUSD in 2012 as part of a renegotiation of a settlement. The settlement requires a class

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of LAUSD's most severely disabled students to go to the same schools as the district's general, non-disabled student body. Appellants want their children to be schooled separately.

The panel held that the district court abused its discretion in denying as untimely appellants' motion to intervene as of right under Fed. R. Civ. P. 24(a). The district court further erred when it found intervention unnecessary to protect appellants' interest in ensuring the receipt of public education consistent with their disabilities and federal law. The panel reversed the district court's denial of the motion to intervene and remanded for further proceedings consistent with its opinion.

## COUNSEL

David Ward German (argued) and Robert Myers, Newman, Aaronson & Vanaman, Sherman Oaks, California; Catherine Blakemore, Melinda Bird, and Candis Watson Bowles, Disability Rights California, Los Angeles, California; for Plaintiffs-Appellees.

Barrett Green (argued) and Maggy Athanasious, Littler Mendelson, P.C., Los Angeles, California; D. Deneen Cox, Associate General Counsel, and Belinda D. Stith, Interim Chief Education and Litigation Counsel, LAUSD Office of General Counsel, Los Angeles, California; for Defendant-Appellee Los Angeles Unified School District.

Suzanne Nancy Snowden (argued), SJM Law Group, LLP, Los Angeles, California; Eric Scott Jacobson, Law Offices of Eric S. Jacobson, Encino, California; for Movants-Appellants Mina Lee, et al.

Seymour I. Amster (argued), Law Offices of Seymour I. Amster; Angela Gilmartin, Law Offices of Angela Gilmartin, Woodland Hills, California; for Movants-Appellants April Munoz, et al.

## ORDER

The opinion filed May 20, 2016 is amended as follows:

*At Slip Op. 4*: Change "Congress enacted the Individuals with Disabilities Education Act (the 'IDEA')" to "Congress enacted the Education for All Handicapped Children Act (which has since been retitled as the Individuals with Disabilities Education Act (the 'IDEA'))."

*At Slip Op. 7:* Change "Cal Ed. Code § 56361" to "Cal. Educ. Code § 56361" and change "'State special schools'—also known as special education centers" to "'State special schools,' *see* Cal. Educ. Code §§ 56361(f); 56367—a term of art which includes 'the California School for the Deaf,' Cal. Educ. Code § 59020, and 'the California School for the Blind,' *id.* § 59120."

*At Slip Op. 34*: Change "—an action expressly prohibited by both the MCD and the Consent Decree." to ".  Indeed, if anything, statements that LAUSD was engaged in 'discussions' to achieve greater compliance with the MCD would have only reinforced Appellants' belief that LAUSD planned to continue to offer special education centers as part of the 'full continuum' of services available to disabled students in LAUSD.  LAUSD now takes the position that the MCD does not require it to maintain any particular number of special education centers, and therefore its actions violate

neither the MCD nor any governing law. LAUSD's argument misses the point. The question before us is whether Appellants were reasonably on notice that their interest in maintaining special education centers as placement options for their children was not being adequately represented by the existing parties to the *Chanda Smith* litigation. We conclude that they were not on notice, because Appellants reasonably construed the MCD as ensuring the maintenance of the special education centers their children attended. The district court therefore erred in reaching a contrary conclusion."

With these amendments, the panel has voted to deny Appellees' June 3, 2016 Petition for Rehearing and Rehearing En Banc. We reiterate that we are not opining on the merits of Appellants' claims that LAUSD's actions violate state and federal law. Appellees' Petition for Rehearing En Banc was also circulated to the judges of this court, and no judge requested a vote for en banc consideration. Accordingly, the Petition for Rehearing and Rehearing En Banc is **DENIED**.

Appellants' June 23, 2016 Motion for an Interim Injunction is likewise **DENIED** without prejudice to refiling in the district court. Appellants have failed to "show that moving first in the district court would be impracticable," given the very late stage of these appellate proceedings. Fed. R. App. P. 8(a)(2)(A)(i). On remand, the district court is directed promptly to enter an order granting Appellants' motion to intervene. The district court shall also timely consider and rule on any motion for injunctive relief.

Appellants' July 11, 2016 Request for Judicial Notice is likewise **DENIED** as moot.

No further filings shall be accepted in this case.

## IT IS SO ORDERED.

---

### OPINION

BEA, Circuit Judge:

Appellants are a sub-class of moderately to severely disabled children who have moved to intervene in a class action brought on behalf of all disabled students in the Los Angeles Unified School District ("LAUSD") against LAUSD ("the *Chanda Smith* Litigation").[1] Appellants seek to intervene to challenge the legality of a new policy, adopted by LAUSD in 2012 as part of a renegotiation of the *Chanda Smith* parties' settlement. That settlement requires a class of LAUSD's most severely disabled students to go to the same schools as the district's general, non-disabled student body. LAUSD calls this "integration"; Appellants want their children to be schooled separately. A district court denied Appellants' motion to intervene. We conclude that the district court abused its discretion in denying Appellants' motion as untimely, and further erred when it found intervention unnecessary to protect Appellants'

---

[1] One group of proposed intervenors is led by Mina Lee and Frances Moreno (the "Mina Lee Proposed Intervenors"), and the other by April Munoz, Julia Flores, and Cheryl Ayapana (the "April Munoz Proposed Intervenors") (collectively, "Appellants," or "Proposed Intervenors" and each, individually, an "Appellant").

interest in ensuring the receipt of public education consistent with their disabilities and federal law.

## I.   SUMMARY OF FACTS

### A.  Relevant Statutory History and Landscape

We are called upon today to review only the district court's denial of Appellant's motion to intervene, and therefore do not opine on whether the actions of LAUSD that prompted Appellants to file their motions violated federal or state law.  Nevertheless, we cannot ignore that at the core of this case is a fundamental disagreement as to the proper approach to education of a class of moderately-to-severely disabled children.  Thus the statutes upon which the present motion rests provide the basis of our analysis.

Before 1975, children with disabilities were often excluded from general public schools and required to attend separate school campuses comprised wholly or primarily of disabled children (termed "special education centers" by LAUSD). 20 U.S.C. § 1400(c)(2)(B).  Following claims that this allocation violated due process, *see, e.g., Mills v. Bd. Of Educ. of the Dist. of Columbia*, 348 F. Supp. 866, 869–70, 875 (D.D.C. 1972), Congress enacted the Education for All Handicapped Children Act (which has since been retitled as the Individuals with Disabilities Education Act (the 'IDEA')).  *See* 20 U.S.C. § 1400, *et seq.*

The IDEA requires that a "free appropriate public education" (a "FAPE") be made available to every disabled child; a FAPE must be fashioned so as to accommodate an individual child's disability.  *See id.* §§ 1401, 1412(a), 1414. To make an adequate FAPE, local education agencies must develop an Individualized Education Program (an "IEP") for each disabled child.  *See id.* § 1414(d).  An IEP consists of a

written statement setting forth the special services and aids the child needs to get a FAPE. *See id.* §§ 1401, 1414.

The IDEA also has a preference for integration of disabled children in the general education schools. But such integration must be beneficial to the disabled child, given the nature and severity of his disability. This preference is found in the IDEA's "Least Restrictive Environment" ("LRE") requirement. It directs that a disabled child should attend regular classes with nondisabled children "[t]o the maximum extent appropriate." *Id.* § 1412(a)(5); *see also* 34 C.F.R. § 300.114(a)(2)(i)–(ii); Cal. Ed. Code § 56364.2. At the same time, however, the IDEA endorses the "removal of children with disabilities from the regular educational environment . . . when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); *see also Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir. 1995) ("In some cases, such as where the child's handicap is particularly severe, it will be impossible to provide any meaningful education to the student in a mainstream environment.").

Consistent with this framework, California law requires educators to maintain a "continuum of [special education] program options." *See* Cal. Educ. Code § 56361. This continuum "include[s], but [is] not . . . limited to" full-time enrollment in "State special schools," *see* Cal. Educ. Code §§ 56361(f); 56367—a term of art which includes "the California School for the Deaf," Cal. Educ. Code § 59020, and "the California School for the Blind," *id.* § 59120.

## B. The *Chanda Smith* Litigation and Outcome 7

Appellants seek to intervene in a class action lawsuit initiated in 1993 in the United States District Court for the

Central District of California by Chanda Smith, a disabled
student then enrolled in LAUSD. The professed purpose of
that suit, brought on behalf of all similarly situated persons,
was "to bring the [LAUSD]'s special education program into
compliance with federal law." The *Chanda Smith* plaintiffs
sought a number of improvements in the provision of special
education, including, to name a few: (1) the centralization
and computerization of all students' records, (2) the
provision of regular training to administrators as to their
"legal and professional obligations to students with
disabilities," (3) the "[r]ecruiting and hiring [of] more
credentialed special education personnel," and (4) the
provision of "a full continuum of special education and
related services . . . [to] students with disabilities at sites as
close to the home of such students as possible." That
"continuum" was to include "all of the following":
(a) "General education classrooms with appropriate
supplemental supports and services"; (b) "A resource
specialist program"; (c) "Nonpublic, nonsectarian school
services"; and (d) "State special schools pursuant to
California Education Code Section 56367," among other
options. This class action culminated in a 1996 Consent
Decree negotiated between Chanda Smith's counsel ("Class
Counsel")[2] and LAUSD. The Consent Decree was framed
in terms of general "recommendations" for improvements in
areas such as those listed above, but lacked any quantifiable
measurements by which to determine whether LAUSD
should be deemed in compliance with the parties' settlement.

A few years later, Class Counsel sought and obtained
court approval of a plan that imposed more objectively

---

[2] Class Counsel are legal organizations with a self-professed
ideological interest in advancing the rights of disabled children and their
families.

quantifiable targets on LAUSD ("Plan 12"). Among other things, Plan 12 called for the effective elimination of special education centers.[3] LAUSD appealed the district court's ruling approving Plan 12. In 2002 and while that appeal was pending, parents of children then enrolled in special education centers in LAUSD served Class Counsel with a motion to intervene. The motion to intervene asserted that Plan 12's elimination of special education centers violated the IDEA's "full continuum" requirement by eliminating an important placement option for disabled children.

Before that motion to intervene was filed with the district court, however, Class Counsel, LAUSD, and the would-be intervenors submitted their dispute to mediation. Class Counsel agreed to withdraw Plan 12. This mediation also led to the execution of a Modified Consent Decree (the "MCD") in 2003, which reaffirmed "[t]he parties['] agree[ment] that special education centers are part of the continuum of program options for a full continuum of special education and related services in the least restrictive environment." MCD ¶ 47. In lieu of eliminating special education centers, the MCD set forth an "Outcome 7." Outcome 7 required the district to increase the percentage of students with disabilities aged 6 to 22, and who are to be placed in the general education setting for 40 percent or more of the school day, from 29 percent to 52 percent by June 30,

---

[3] Under Plan 12, disabled children could comprise no more than 15 percent of any school's population. Because special education centers are comprised heavily or wholly of disabled students, Plan 12's 15 percent limitation would have effectively eliminated special education centers. The LAUSD objected to the plan by moving to modify and/or stay portions of the Consent Decree. The district court denied LAUSD's motion, which had the practical effect of approving Plan 12.

2006.**[4]**  Outcome 7 also limited to 48 percent those disabled
students who were to spend more than 60 percent of the
instructional day in any of the following: (a) special
education classes at a general education facility, (b) a public
special education center, (c) a non-public school with a
contract to provide special education services to LAUSD
students ("Non-Public Schools"), or (d) a private residence
or hospital learning environment.  The MCD also established
an "Independent Monitor" to oversee the LAUSD's progress
in meeting this and other Outcomes.

Because Outcome 7 was directed to increasing the
integration of disabled students in all four of the groups
making up the 48 percent into LAUSD's general education
classes, reduction of full-time enrollment of disabled
students in special education centers was but one of many
ways LAUSD could achieve compliance with the MCD.
Indeed, LAUSD necessarily had to look elsewhere than to
special education centers to comply with Outcome 7—not
only because the MCD acknowledged the special education
centers as an important part of the continuum of educational
services available to disabled children, but also because

---

**[4]** Notably, Outcome 7 excluded students with Specific Learning
Disabilities ("SLD") and "Speech and Language" Impediments ("SLI"),
the integration of whom was governed by Outcome 6 (which is not at
issue in the present litigation).  The SLD classification encompasses
children with a "severe discrepancy between intellectual ability and
achievement" in a particular area (such as "basic reading" or
mathematics) due to "a disorder in one or more . . . basic psychological
process[]," such as "attention" or "visual processing."  The SLI
classification encompasses children with speech impediments or
language fluency issues *not* due to unfamiliarity with English.  *See IEP
Eligibility*, L.A. UNIFIED SCH. DIST. (last visited Jan. 25, 2016),
http://achieve.lausd.net/Page/3346.

enrollment in these centers accounted for a very small percentage of disabled student enrollment in LAUSD.[5] Based on Class Counsel's abandonment of its plan to eliminate special education centers and the language in the MCD which specifically guaranteed their retention, the parent group agreed not to intervene.

LAUSD initially made significant progress towards Outcome 7. By September 2007, placement of disabled children included in Outcome 7 in general education classes for at least 40 percent of the school day had increased from 29 percent to 47 percent—though it turned out that this reported progress was somewhat inflated.[6] Declaration of

---

[5] In 1998 (several years before the adoption of the Consent Decree) only 5,298 of the roughly 80,000 students in LAUSD who received special education were enrolled in special education centers. By June 24, 2012, enrollment in special education centers had fallen to 2,190— though enrollment in Non-Public Schools increased over the same time period. Indeed, at least half the reduction in enrollment in special education centers from 1998 to 2012 was offset by increased enrollment in Non-Public Schools, enrollment in which increased 47 percent between 1998 and 2012 (from 3,101 to 4,552).

[6] A review of students' actual class schedules revealed that administrators were "overestimat[ing]" the time disabled students were spending in general education classes in order to create the appearance that these targets were being met. *See, e.g.*, Independent Monitor's Annual Report for the 2008–2009 School Year. Indeed, the Independent Monitor's September 29, 2010 report noted three years of "increasing[] overestimat[ion] [of] the number and percentage of students in the general education setting for 40% or more of the day." (The Independent Monitor's Annual Report for the 2009–2010 School Year explained: "As noted in previous reports, a primary contributing factor to these discrepancies is that schools appear to be entering a percent of time below 60% in special education without regard or consideration of the student's [actual] class schedule."). *See also* Independent Monitor's Annual Report for the 2010–2011 School Year (stating the same).

Frederick J. Weintraub ("Weintraub"), the Independent Monitor, ¶ 7. But as the pool of disabled students included in Outcome 7 who spent most or all of their day outside general education classes and schools dwindled, it became increasingly difficult for LAUSD to identify students for whom greater integration was possible and beneficial.

Difficulties complying with Outcome 7 led to renewed negotiations in September 2008 between Class Counsel, the LAUSD, and the Independent Monitor, who ultimately adopted a two-part modification to Outcome 7 (termed "Outcome 7A" and "Outcome 7B," or collectively, "Modified Outcome 7"). Weintraub Decl. ¶¶ 8, 9. Modified Outcome 7 reduced the integration targets imposed by original Outcome 7 by exempting from compliance disabled students aged 18 to 22 and significantly reducing the percentage of students with orthopedic disabilities who were required to attend general education classes.

LAUSD remained unable to meet Outcome 7, even as modified. The Independent Monitor ultimately concluded in its February 17, 2012 report that meeting Modified Outcome 7 "would require the arbitrary transfer of a significant number of . . . students" from special education centers to general education campuses, an approach the Independent Monitor had never endorsed, *see, e.g.*, Independent Monitor's Annual Report for the 2010–2011 School Year ("As noted in past reports, . . . [efforts to integrate special education students as required by Outcome 7] should be in the best interest of the student and not solely motivated by progress on this [integration] outcome.").

Commencing in October 2011, yet another round of negotiations between the parties and the Independent Monitor ensued. This led to an amendment to the MCD memorialized in a stipulation executed September 14, 2012

("Renegotiated Outcome 7"). Renegotiated Outcome 7 provided that LAUSD would be deemed fully compliant with Modified Outcome 7 if it accomplished two new goals: (a) a flat 33 percent decrease in special education center enrollment by June 2015;[7] and (b) integration of all "[s]tudents with moderate to severe disabilities at co-located schools" into "general education classes an average of 12% of the instructional day and during lunch, breaks/recess and school-wide activities."[8] As described in detail below, the implementation of Renegotiated Outcome 7 in the 2013–14 school year brought substantial changes to the educational opportunities afforded children who attended (or sought to attend) special education centers in 2012. By 2014, over 8 of LAUSD's 18 special education centers had been closed to

---

[7] This would represent a reduction of approximately 650 disabled students from schooling in special education centers, based on June 2012 enrollment statistics.

[8] We remain unable to decipher the precise meaning of "co-located"—an amorphous term used by LAUSD in 2012 and 2013 to describe its implementation of Renegotiated Outcome 7. At times, LAUSD used the word "co-located" in lieu of "closed" to refer to a special education center which has undergone the physical transfer of all its students and resources from the special education center to a general education school (*e.g.*, with respect to the closure of Blend Special Education Center for the Blind). At other times, "co-located" was used to describe special education centers that shared a physical border with a general education campus (*e.g.*, in the case of Banneker Special Education Center). By 2014, LAUSD interpreted Renegotiated Outcome 7's requirement that students at "co-located schools" spend an average of 12 percent of their day in general education classes as applying to disabled students at 13 of LAUSD's 18 special education centers. Sometimes this meant the complete closure of a special education center; other times it meant the transfer of disabled students to a general education school for some part or all of the school day.

enrollment to disabled children under the age of 18. Parents of affected students were not invited to participate in the LAUSD/Class Counsel/Independent Monitor negotiations, which commenced in October 2011, *supra* p.14, nor were their viewpoints solicited in the negotiation, adoption, or implementation phases of Renegotiated Outcome 7.[9]

LAUSD did not start notifying parents of children affected by Renegotiated Outcome 7, or provide any information as to *how* it intended to accomplish Renegotiated Outcome 7's dual mandates, until Spring 2013. As explained below, LAUSD's notice varied significantly, but bore certain common themes.

Appellants whose children had attended Blend Special Education Center for the Blind ("Blend") were generally told during individual parent IEP meetings in Spring 2013 that placement at Blend (or any other special education center) was no longer an option for their child; the Blend faculty and student body was being relocated in its entirety to a general education school.

About the same time, parents of children attending Banneker Special Education Center ("Banneker") were told that their school would be "co-located" with Avalon Gardens Elementary ("Avalon Gardens"), a general education campus, starting in the 2013–14 school year. At the

---

[9] In fact, the Independent Monitor's reports treated parental resistance to increased placement of severely disabled students on general education campuses as an obstacle to be overcome. *See, e.g.*, Independent Monitor's Annual Report for the 2010–2011 School Year (instructing that "the District is encouraged to continue its work with families to explore existing and new classes on general education campuses. While families may resist, it is important they be exposed to options available outside of special education centers").

commencement of the 2013 school year, parents learned that this meant that students enrolled in Banneker would be transported to Avalon Gardens for an average of 12 percent of their instructional day for "integration activities."   In February 2014 (*after* the motion to intervene at issue in this case was filed), Banneker parents learned that LAUSD would be closing Banneker altogether and relocating its student body to Avalon Gardens starting in the 2014–15 school year. *See* Mina Lee Request for Judicial Notice ("Lee RJN"), Exh. A (Feb. 14, 2014 letter), Exh. E (March 21, 2014 letter from LAUSD explaining that Banneker, which, among other things, had offered one of the district's primary "mentally retarded severe" ("MRS") programs for school-aged special education children, was being transitioned into a Career Transition Center, a school that teaches vocational and basic living skills to young adults aged 18 to 22).[10]

---

[10] Both sets of Appellants have requested this court take judicial notice of various letters created and sent by the executive director of LAUSD to Appellants, as well as annual reports issued by the Independent Monitor.  Both the letters and the reports summarize LAUSD's progress in implementing Renegotiated Outcome 7, and both post-date Appellants' motions to intervene, so it would have been impossible for Appellants to have included such letters and reports in support of their original motions.  LAUSD does not dispute the authenticity or veracity of any of these documents.  *Cf.* Fed. R. Evid. 201 (courts may take judicial notice of facts only if their veracity "cannot reasonably be questioned").  Moreover, courts routinely take judicial notice of letters published by the government (and here, the executive director of LAUSD was a government employee), *see, e.g.*, *Cactus Corner, LLC v. U.S. Dept. of Agriculture*, 346 F.Supp.2d 1075 (E.D. Cal. 2004), as well as "records and reports of administrative bodies," *see Interstate Natural Gas Co. v. S. Cal. Gas. Co.*, 209 F.2d 380, 385 (9th Cir. 1953).  We therefore find Appellants' documents can be judicially noticed and grant Appellants' motions for judicial notice.

Notice to parents of disabled children attending Lanterman Special Education Center ("Lanterman") took the form of a field "trip slip" that was circulated to parents in the *Fall* of 2013—about a year after the adoption of Renegotiated Outcome 7. The "trip slip" purported to seek temporary authorization to transport Lanterman students to a general education school for an integration "test." Appellants have offered evidence that LAUSD used the field trip slips to justify the permanent and daily transportation of Lanterman students to general education classes.

Affidavits submitted by parents of children who were previously enrolled full-time at Lull Special Education Center, Lokrantz Special Education Center, and McBride Special Education Center contain accounts similar to those described by Blend and Banneker parents.

Aside from the different types of individualized notice related above, Executive Director of Special Education in LAUSD, Sharyn Howell, circulated a letter on May 21, 2013 to the "LAUSD Community" (the "Howell Letter"), announcing that Modified Outcome 7 had been again renegotiated on September 14, 2012 and that, as a result, a "reduc[tion] [in] the number of students with moderate to severe disabilities ages 6–18 at segregated special education centers" would occur. The Howell Letter indicated that four special education centers (Banneker, Blend, McBride, and Miller) would be affected in the 2013–14 school year. The letter further explained that all pre-school-aged special education students would be sent to general education schools, rather than to special education centers. *See* Aguilar Decl. ¶ 7 (noting declining enrollment in several special education centers as a result of the district's new policy against permitting new student enrollment); *see also* Berrios Decl. ¶¶ 6–7 (stating the same).

As the Howell Letter indicated, 2013 was a year of great changes.  Even those Proposed Intervenors who received notice through IEP meetings in Spring 2013 that their children would receive "integration opportunities" in the coming school year were left uncertain as to the actual effects on them of Renegotiated Outcome 7.  *See, e.g.*, J. Flores Decl. ¶ 9.  Many parents, particularly those for whom English is a second language, were incorrectly led to believe that the services and curriculum offered their children would remain the same despite the transfer to a new school.  *See, e.g.*, J. Flores Decl. ¶ 12; A. Flores Decl. ¶ 4; Lee Decl. ¶ 6; Chamu Decl. ¶¶ 4–5.  Many parents claim simply not to have appreciated the effects of the changes until their children began coming home after school with bruises and other injuries in late August and September of 2013—injuries Appellants' children suffered while in general education schools.  *See, e.g.*, J. Flores Decl. ¶ 11; A. Flores Decl. ¶ 6; Hernandez Decl. ¶¶ 3–4; Chamu Decl. ¶ 6; Hernandez Decl., Exh. E (photographs of injuries); J. Flores Decl., Exh. C (photographs of injuries).  Parents also discovered in Fall 2013 that the general education campuses to which their children (and over 500 other moderately to severely disabled children) were being transferred had not been adapted, through tangible construction alterations, to provide a safe and effective learning environment, as memorialized in the Independent Monitor's October 2014 Report.  *See* Munoz RJN, Exh. 1, p. 4.[11]

---

[11] Much of the necessary alteration was not scheduled to *start* until the summer of 2015.  The Independent Monitor's report following the 2013–14 school year also noted a number of "questionable" planning decisions that seemed unlikely to safeguard the health and safety of disabled students even after renovations were completed.  *Id.*  For example, areas designated for "[diaper] changing, feeding and health care protocols"

These discoveries came shortly after small group meetings between Stephen Maseda (who became counsel to the Mina Lee Proposed Intervenors), April Munoz (an Appellant), unspecified LAUSD board members, Howell, the Independent Monitor, and Class Counsel on August 2 and 5, 2013, respectively. Maseda Decl. ¶¶ 10–13; Munoz Decl. Munoz and Maseda concluded that neither LAUSD nor Class Counsel represented their interests or believed that special education centers should be a part of the continuum of special education opportunities available to disabled children in LAUSD.

On October 15, 2013, and October 23, 2013, seventy-one and seventy-nine days after concluding their interests were not being represented by LAUSD or Class Counsel, respectively, two groups of parents (the April Munoz Proposed Intervenors and the Mina Lee Proposed Intervenors) moved to intervene "individually and on behalf of all other persons similarly situated" as a matter of right, *see* Fed. R. Civ. Proc. 24(a), or, in the alternative, under Rule 24(b) (permissive intervention). Appellants' cases were consolidated, and the district court denied both motions on January 16, 2014. The court rejected Appellants' Rule 24(a) motion to intervene as a matter of right as untimely or,

---

"were located inside classrooms that lacked running water and drainage"; special education classrooms were placed "over 350 feet" from bathrooms scheduled to be renovated to accommodate disabled children; the placement of bus drop-offs and lunch areas required blind children "to navigate slopes, uneven steps, tripping hazards and protruding objects" to get to class; visually impaired children were also placed in "an isolated part of the campus with inaccessible bathrooms." *Id.* Exh. 1, p. 4; Exh. 2, p. 3.

alternatively, as unnecessary to protect Appellants' interests.[12]

## II. LEGAL ANALYSIS

### A. Standard of Review

Appellants appeal the denial of their motion to intervene as a matter of right pursuant to Rule 24(a)(2). An applicant for intervention under Rule 24(a)(2) must establish four elements: (1) that the prospective intervenor's motion is "timely"; (2) that the would-be intervenor has "a 'significantly protectable' interest relating to . . . the subject of the action," (3) that the intervenor is "so situated that the disposition of the action may as a practical matter impair or impede [the intervenor's] ability to protect that interest"; and (4) that such interest is "inadequately represented by the parties to the action." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011) [hereinafter "FFRF"]. Though the applicant bears the burden of establishing these elements, we have repeatedly instructed that "the requirements for intervention are [to be] broadly interpreted in favor of intervention." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004); *see also Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (noting that "[a] liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts" (quoting *United*

---

[12] The court also rejected Appellant Rule 24(b) motion for permissive intervention as untimely. In the alternative, it "exercise[d] its discretion to deny" permission intervention on the grounds that it would prejudice existing parties and "open the floodgates to additional proposed intervenors."

*States v. City of Los Angeles*, 288 F.3d 391, 397–98 (9th Cir. 2002) (alteration in original)).

A lower court's denial of a motion to intervene is reviewed *de novo*, except that its timeliness determination is reviewed for abuse of discretion. *Alisal*, 370 F.3d at 918–19. A court abuses its discretion if it fails to apply the correct legal rule or standard. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). And even "[i]f the trial court identified the correct legal rule," we may find an abuse of discretion if the court's application of that rule was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotation marks omitted).

## B. Timeliness

Timeliness is determined by the totality of the circumstances facing would-be intervenors, with a focus on three primary factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Alisal Water*, 370 F.3d at 921. In analyzing these factors, however, courts should bear in mind that "[t]he crucial date for assessing the timeliness of a motion to intervene is when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). As explained below, the district court's analysis did not follow this basic principle. We accordingly hold that the court abused its discretion in finding Appellants' motions untimely under the totality of the circumstances of this case.

## 1.  *Stage of the Proceedings*

It is true that Appellants seek to intervene in this action approximately twenty years after its commencement, and seventeen years after the adoption of the first Consent Decree.   However, in analyzing the "stage of the proceedings" factor, the "[m]ere lapse of time alone is not determinative." *United States v. State of Oregon*, 745 F.2d 550, 552 (9th Cir. 1984).  Where a change of circumstances occurs, and that change is the "major reason" for the motion to intervene, the stage of proceedings factor should be analyzed by reference to the change in circumstances, and not the commencement of the litigation. *See id.*

We previously applied this rule in *State of Oregon*, where the State of Idaho moved to intervene in litigation between the States of Washington and Oregon and various Indian Tribes, fifteen years after the commencement of that action in 1968, and five years after a settlement had been reached in 1977. *Id.* at 551–52.  Notwithstanding the substantial lapse in time, we held that the "stage of proceedings" factor *supported* a finding of timeliness because a "change of circumstance" had occurred in 1982— two Indian tribes had given "notice of their intent to withdraw from the [settlement] or to renegotiate it" which created "the possibility of new and expanded negotiations." *Id.* at 552.  We concluded that this change in circumstances weighed in favor of a finding that the State of Idaho's August 1983 motion to intervene was timely. *Id.* at 552–53 (holding that the district court abused its discretion in denying the motion to intervene as untimely).

Here, the district court's conclusory determination that Renegotiated Outcome 7 did not constitute a change in circumstances because it "appears to be just another

modification to the MCD aimed at further integration," was contrary to any plausible interpretation of the record. Perhaps viewed as a progression towards "integration," Renegotiated Outcome 7 represented only "another step" in LAUSD's march toward the goal of greater integration of disabled children in LAUSD's schools; attempts—some successful, some not—toward integration had been occurring since the adoption of the original Consent Decree. But the record demonstrates that Renegotiated Outcome 7 caused a substantial change in the educational opportunities afforded the group of disabled students of the LAUSD who attended special education centers prior to 2013—namely, the group now seeking to intervene.

From 1993 to 2012, LAUSD operated approximately 18 special education centers throughout the school district, and it offered full-time placement at those schools for children whose IEPs so recommended. During that time, the placement of these students (including, at times, the transfer of a student from a special education center to a general education school) was conducted through case-by-case assessments of individual students, by IEP teams and with parental involvement and consent; indeed, parents retained some influence over, and input into, their child's placement, including the opportunity to object during the IEP process to their child's removal from a special education center.[13] *See,*

---

[13] For example, the Independent Monitor's 2010-11 Report indicated that, of the "95 children identified as potential students to transition" from special education centers to general education campuses, only 27 were actually transferred. The Independent Monitor attributed the low transfer rate to parental resistance to the removal of their children from special education centers.

*e.g.*, Efron Decl. ¶¶ 34–36; Gliona Decl. ¶¶ 6, 8, 10; Ayapana Decl. ¶¶ 4–5.

Since Renegotiated Outcome 7, however, severely disabled children have been transferred *en masse* to general education campuses, over parental objections. At least 8 of the 18 special education centers have been closed to enrollment by Appellants and similarly situated disabled students.[14] Appellants have offered evidence that parents are not consulted in the development of their child's IEP. Rather, they are told that placement in a special education center is no longer an option. If they disagree with a predetermined placement, their only recourse is to file an administrative appeal. *See, e.g.*, Maseda Decl. ¶ 7; Lee Decl. ¶ 4; J. Flores Decl. ¶ 13; A. Flores Decl. ¶ 4; Gliona Decl.

---

[14] As discussed above, Blend Special Education Center for the Blind was the first special education center to close. LAUSD disputes that the transfer of all students, teachers, assistants, and curriculum materials from a special education center to a general education campus constitutes the "closure" of a special education center. We reject this slight on the meaning of words. For all practical purposes, the complete transfer of students, teaching staff, and resources from a school is a closure of that school, at least as to those students and that teaching staff. Moreover, letters prepared by LAUSD demonstrate that at least seven more special education centers have followed suit: A letter dated March 3, 2014 from LAUSD to parents of students at Lull Special Education Center explained that the school's "teachers, assistants and classroom materials" would be "relocated to Northridge Middle School," a general education school. Lee RJN, Exh. B. A letter dated March 21, 2014 (again, from the school district) announced that at the commencement of the 2014–15 school year six more of LAUSD's remaining special education centers (Banneker, Salvin, Willenberg, Marlton, Leichman, and Perez) would be converted into "Career Transition Centers." Lee RJN, Exh. E (also explaining that "[t]his transition means that our 7–11 graders will be relocated to other campuses"). As noted, Career Transition Centers are schools that teach children ages 18 to 22 basic job and independent living skills.

¶¶ 8–9, 11, 15–17; Goldberg Decl. ¶ 4. Starting in 2013, LAUSD began conducting individual student and parent IEP meetings with an attorney present. *See* Gliona Decl. ¶ 8; Gliona Decl. ¶ 7. Whereas the 2003 MCD had stated that special education centers were an important part of the "continuum" of educational opportunities available to disabled children, LAUSD Executive Director of Special Education, Sharyn Howell, has now taken the position that special education centers are unnecessary because the district can "provide all supports and services . . . at a general education site." Howell Decl. ¶ 4.

Additionally, the record indicates that most, if not all, students formerly enrolled full-time in special education centers (regardless of whether their schools have been closed) are now required to spend an average of 12 percent of their instructional day in general education classes—most frequently physical education, music, theater, and art classes. This curriculum change has been imposed on students whose individual IEPs previously recommended full-time placement in a special education center.[15]

In short, if the "possibility" of negotiations constituted a change of circumstances in *State of Oregon*, then LAUSD's

---

[15] For example, J.R.C. is blind, cannot communicate verbally, and is severely developmentally delayed; yet starting in the 2013–14 school year, he was required to attend "integrated" physical education classes over his parents' objection that such integration is not safe. Chamu Decl. ¶ 9; *see also* Gliona Decl. ¶ 5 (offering a comparison of J.R.C.'s IEP with the State of California's standards for the general education classes in which J.R.C. is now enrolled, and asserting that general education classes are incompatible with any reasonable reading of J.R.C.'s IEP). To give another example, S.L., who is blind and deaf, is required to attend general education music and physical education classes pursuant to Renegotiated Outcome 7. Lee Decl. ¶ 5; *see also* Fazzi Decl. ¶ 7.

adoption of a flat quota requiring the reduction of special education center enrollment by 33 percent, since it has led to an overhaul of LAUSD's approach to educating its moderately to severely disabled students enrolled in special education centers in LAUSD, is all the more so a "change in circumstances," at least *as to Appellants*.

As in *State of Oregon*, the adoption of Renegotiated Outcome 7 in 2012 marked the commencement of a "new stage" in the *Chanda Smith* Litigation. For purposes of the "stage of proceedings" analysis, it is critical that Appellants have moved to intervene to challenge only Renegotiated Outcome 7 and the manner by which it has been implemented—in other words, the most current stage of the *Chanda Smith* Litigation. Appellants are not seeking to reopen decades of litigation. Thus, it was error to measure the timeliness of Appellants' motions by reference to stages of litigation pre-dating the change in circumstances that motivated Appellants' motion to intervene. *See, e.g.*, *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 907 (D.C. Cir. 1977) (cited with approval in *State of Oregon*, 745 F.2d at 552) ("[T]he amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness. Rather, the court should also look to the related circumstances, including the purpose for which intervention is sought . . . ." (first alteration in original)).**[16]**

---

**[16]** In *Costle*, the Natural Resources Defense Council sued the Environmental Protection Agency ("EPA") and successfully negotiated a settlement whereby the EPA was required to establish regulations governing water pollution. *Id.* at 906. Rubber and chemical companies sought to intervene at the time of settlement to participate in the oversight and implementation of the settlement agreement. *Id.* at 907. The appellate court held that the district court had abused its discretion in denying the companies' Rule 24(a)(2) motion to intervene, because the

In failing to analyze timeliness in light of the change in circumstances detailed above, the district court abused its discretion by failing to apply the correct legal rule.  *See Hinkson*, 585 F.3d at 1262.

Our holding that Renegotiated Outcome 7 constituted a "change in circumstances" is confined to the specific facts of this case.  The systematic change in circumstances that occurred here, coupled with the fact that (as discussed further below), Appellants moved to intervene as soon as reasonably practicable following such change, serves to distinguish the present case from the sole authority cited by the district court, *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, 674 F.2d 970, 974–75 (3d Cir. 1982).[17]

---

purpose of the intervenors' motion *related to the current stage of the proceedings* and was therefore timely, notwithstanding appellants' three-year delay in moving to intervene since the commencement of the litigation.  *Id.* at 906–08.

[17] In *Delaware Valley*, a group of Pennsylvania state legislators sought to intervene in a high-profile lawsuit against the State of Pennsylvania and various state entities to compel the passage of legislation related to automobile emissions pursuant to the Clean Air Act.  *Id.* at 971–72.  They did so almost two years after the execution of a consent decree requiring the passage of emissions legislation.  *Id.*  Though the Third Circuit did not give precise dates, it reasoned that the legislators were or should have been on notice of the suit, and the consent decree, well before they moved to intervene.  *Id.* at 974–75 (explaining that one prospective intervenor had even proposed legislation pursuant to the consent decree). The court found the sole justification offered for the legislators' delay— that they were "busy"—insufficient.  *Id.* at 975.  The court further rejected the legislators' argument that their motion was timely simply because it was filed 45 days after the first modification to the consent decree.  *Id.* at 974.  The court reasoned that the modification did not make the motion timely because "none of the circumstances or facts upon

In sum, the stage of proceedings factor weighs in Appellants' favor.

## 2. *Prejudice to Other Parties*

We have previously held that prejudice to existing parties is "the most important consideration in deciding whether a motion for intervention is untimely." *State of Oregon*, 745 F.2d at 552. We have also recognized that courts may find prejudice on the basis of non-monetary factors: For example, if granting a belated motion to intervene would threaten the delicate balance reached by existing parties after protracted negotiations, this factor may weigh against intervention. *See, e.g.*, *Cty. of Orange v. Air Cal.*, 799 F.2d 535, 538 (9th Cir. 1986). However, we emphasized in *State of Oregon* that the only "prejudice" that is relevant under this factor is that which flows from a prospective intervenor's failure to intervene after he knew, or reasonably should have known, that his interests were not being adequately represented—and not from the fact that including another party in the case might make resolution more "difficult[]." 745 F.2d at 552–53; *see also Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977) ("With respect to the second factor, the district court again applied an incorrect legal standard. For the purpose of determining whether an application for intervention is timely, the relevant issue is not how much prejudice would result from

which appellants base their claim for relief have changed since the [unmodified] consent decree was entered." *Id.* at 975. Moreover, the proposed intervenors were not seeking to intervene to challenge the modification, but rather sought to "scrap[]" the original consent decree itself. *Id.* Under the totality of these circumstances, the Third Circuit concluded, the district court had not abused its discretion in denying the legislators' motion to intervene as untimely. *Id.*

allowing intervention, but rather how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest in the case.").

In *State of Oregon*, various Indian tribes and the States of Washington and Oregon argued that permitting the State of Idaho to intervene in litigation fifteen years after the commencement of the litigation regarding the regulation of fishing would jeopardize the existing parties' negotiations. 745 F.2d at 552–53. We rejected this argument. We found no prejudice because "the existing parties' concerns have little to do with timeliness. They do not suggest that their problems are materially different now than they would have been had Idaho sought to intervene a decade or more ago." *Id.* at 553. We therefore reversed the lower court's denial of the State of Idaho's motion to intervene. *Id.*

As in *State of Oregon*, the district court's finding of prejudice here was untethered to any prejudice which was caused by Appellants' delay. The district court reasoned that permitting intervention "would prolong the litigation," because it would "upset the delicate balance the Parties and the Independent Monitor have sought and achieved through careful negotiation and research" in devising Renegotiated Outcome 7 (chronicling the lengthy negotiations of Renegotiated Outcome 7 between Class Counsel, the Independent Monitor, and Dr. David Rostetter, a special education expert, which culminated in Renegotiated Outcome 7). But this is merely an argument that permitting the parties who concluded they were detrimentally affected in 2013 by Renegotiated Outcome 7 to participate in its negotiation and implementation would make achieving resolution more difficult, given the parties' competing interests. Because this would be true regardless of when the

intervention occurred, it is unrelated to timeliness, and cannot support a finding of prejudice under *State of Oregon*.

The district court also cited LAUSD's expenditure of resources in transferring special education students, programs, and resources to general education schools and campuses. That would be relevant *had* Appellants failed to act in the face of reasonable notice from LAUSD of its plans to close special education centers *en masse* and had LAUSD invested significant resources in reliance on that delay. *Cf. Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("The crucial date for assessing the timeliness of a motion to intervene is when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties.").

But that is not what happened here. LAUSD parents were excluded from the negotiations that led to the adoption of Renegotiated Outcome 7 in September 2012. And in the year between the adoption of Renegotiated Outcome 7 and its initial implementation in August 2013, Appellants were consistently uninformed or misinformed as to the existence and true effects of Renegotiated Outcome 7.[18] The Fifth Circuit has recognized, and we agree, that existing parties cannot complain about delay or prejudice caused by their

---

[18] Some parents were told that the district was merely changing the name of their child's school. Others were more accurately told that their child would be transferred to a general education school or campus, but assured that their child's curriculum would remain the same in all respects. Of course, neither of these statements were accurate given the new requirement that special education center students be "integrated" in general education classes for lunch, recess, and 12 percent of the instructional day. Nor did these statements reasonably put Appellants on notice that LAUSD would be outright closing eight special education centers by the end of 2014.

own efforts to thwart the provision of meaningful notice to affected parties.  *See Stallworth*, 558 F.2d at 267 (holding that a district court abused its discretion in finding a motion to intervene untimely where an existing party had previously prevented notice to affected parties).

That principle has particular application here, where the consequences of Renegotiated Outcome 7 were uniquely within LAUSD's knowledge and control, given that LAUSD was its implementing party.  Instead of clearly apprising affected parents as to how LASUD intended to implement the changes precipitated by Renegotiated Outcome 7, LAUSD issued incomplete information throughout 2013. As a result, the full extent of Renegotiated Outcome 7 was not revealed until 2014 and 2015—well *after* Appellants' filing in Fall 2013 of the supposedly untimely motion to intervene at issue in this appeal.**[19]**

---

**[19]** To illustrate, the first district-wide notice of Renegotiated Outcome 7, the Howell Letter circulated on May 21, 2013, indicated that the district would be developing "integration plans" to "co-locate[]" four special education centers (Banneker, Blend, McBride, and Miller) with four "general education pioneer counterparts (Avalon Gardens, Van Ness, Grand View, and Cleveland SH, respectively)."  It described in glowing terms the district's plans to offer integration "opportunit[ies]" through "arts," "physical education," and "social activities . . . to increase the integration of . . . students with disabilities."  Critically, it promised that LAUSD would be "working with school site staff *and families* to analyze the Individualized Education Programs (IEPs) of students with disabilities to determine how to most effectively increase the integration of students based on their *individual needs*." (emphasis added).  Nowhere does the May 2013 letter indicate that, just one year later, LAUSD would be closing approximately half of its special education centers, without any prior "working with . . . families."

When our inquiry is properly narrowed to the prejudice attributable to Appellants' delay in moving to intervene after the time Appellants knew, or reasonably should have known, that their interests were not being adequately represented by existing parties, the prejudice to existing parties becomes nominal at best. Indeed, neither the district court nor LAUSD has pointed to any evidence whatsoever of additional costs or other prejudice suffered between August 2013 and October 2013. The district court accordingly abused its discretion in concluding that this factor weighed against intervention.

### 3. *Reason for and Length of the Intervenor's Delay*

For the reasons already explained above, the district court erred to the extent it measured the length of Appellants' delay by reference to events pre-dating the time at which Proposed Intervenors were reasonably on notice

---

The rhetoric used in the May 2013 letter can be sharply contrasted with the notice provided to parents in 2014—notably, *after* the motion to intervene at issue in this appeal was filed. Letters sent to parents of students at various special education centers in February of 2014, for example, state that all the "teachers, assistants and classroom materials are expected to re-locate" from various special education centers to general education campuses. *See* Lee RJN Exh. A (Letter to Banneker parents); *see also id.* Exh. B (Letter to parents of students attending Lull Special Education Center); Exh. C (Letter to parents of students attending Perez Special Education Center); Exh. E (Letter to parents of Banneker and Doyle special education centers, explaining that "[t]he district . . . has decided to continue transitioning the Special Education Schools to Career Transition Centers. For the 2014–2015 school year, the Special Education Schools becoming Career Transition Centers are: Banneker, Salvin, Willenberg, Marlton, Leichman, and Perez . . . . This transition means that our 7–11 graders will be relocated to other campuses."). Whatever "co-location" was supposed to mean, *see supra*, n.8 that term had served its purpose; by 2014, it disappeared.

that their interests were not being adequately represented, *see Smith*, 194 F.3d at 1052—and certainly to the extent the court relied on events predating the change in circumstances that prompted Appellants' current motion to intervene. In *State of Oregon*, for example, the "changed circumstances" giving rise to the motion to intervene occurred "in 1982 when two of the Tribes gave notice of their intent to withdraw from the Plan or to renegotiate it." *State of Oregon*, 745 F.2d at 552. Yet the proposed intervenors did not file until late August 1983. *Id.* Despite at least an eight-month delay (the opinion is not clear as to when in 1982 the tribes gave the notice referenced above nor when the State of Idaho received that notice), we held that the "reason for and length of delay" factor weighed in *favor* of intervention. *Id.* Similarly here, Appellants moved to intervene approximately one year after the change in circumstances prompting their motion but, as discussed below, only weeks after definitively learning that their interests were not adequately represented by the existing parties.

Here, not only was the district court's analysis contrary to law, it was contrary to the record before the court. For example, the district court concluded that Appellants "arguably have been on notice from the very beginning of this litigation." But how can that be true when many of the Proposed Intervenors' children had not even been born at the inception of the litigation, let alone been born disabled?

The district court alternatively suggested that Proposed Intervenors have been on notice of this action since 2002, when a group of parents served Class Counsel with an earlier motion to intervene. The court's conclusions are logically fallacious because most of the Proposed Intervenors did not even have children enrolled in LAUSD in 2002—much less

in 1993 when this litigation commenced.[20]  Appellants could not possibly have been on notice that their interests were not adequately represented prior to having any interest in this litigation at all.  The district court's analysis therefore incorrectly conflated the knowledge of an entirely different group of parents with Appellants' knowledge.

Nor should the fact that "the inclusion of special education students into the general education program has been a primary issue from the beginning of this case" have placed Appellants on notice that intervention was necessary to protect their interests prior to 2013.  Both the 1996 Consent Decree and the 2003 MCD specifically required LAUSD to maintain special education centers throughout the district as placement options for moderately to severely disabled children.  Consistent with this mandate, LAUSD continued to operate approximately the same number of special education centers throughout the district from 1993 to 2013.  That LAUSD continued to offer placement in special education centers despite *decades* of discussions about greater integration of disabled children in the general education environment only contradicts the lower court's conclusion that the same discussions should have placed Appellants on notice that LAUSD planned to start closing special education centers *en masse* in 2013 and 2014.

---

[20] Appellant Lee's and Ayapana's children were 14 years old in October 2013, making them only 4 in 2003.  Appellant Moreno's daughter and Appellant J. Flores' son were 10 years old in October 2013, meaning they were newborns in 2003.  The only potential exception is Linda Buschini (a member of the April Munoz Proposed Intervenors), who was a member of the parent group who sought to intervene in 2002.  Even so, Buschini's involvement in 2002 could not reasonably have placed her on notice of the change in circumstances that occurred in 2012, given that the 2003 MCD specifically guaranteed the retention of special education centers.

Indeed, if anything, statements that LAUSD was engaged in "discussions" to achieve greater compliance with the MCD would have only reinforced Appellants' belief that LAUSD planned to continue to offer special education centers as part of the "full continuum" of services available to disabled students in LAUSD. LAUSD now takes the position that the MCD does not require it to maintain any particular number of special education centers, and therefore its actions violate neither the MCD nor any governing law. LAUSD's argument misses the point. The question before us is whether Appellants were reasonably on notice that their interest in maintaining special education centers as placement options for their children was not being adequately represented by the existing parties to the *Chanda Smith* litigation. We conclude that they were not on notice, because Appellants reasonably construed the MCD as ensuring the maintenance of the special education centers their children attended. The district court therefore erred in reaching a contrary conclusion.[21]

---

[21] Specifically, the district court cited a statement in the Independent Monitor's October 5, 2011 Annual Report that meeting one aspect of Modified Outcome 7 "would require the arbitrary transfer of a significant number of [multiple disabilities orthopedic] students. The Parties are currently engaged in discussions to find a solution to this problem." But in context, this statement undercuts the district court's conclusion. The Independent Monitor certainly was not *advocating* the "arbitrary" transfer of students; indeed, that would be contrary to the IDEA's IEP requirement. Thus, the Independent Monitor's statement could not reasonably be construed as notice that LAUSD intended to start "arbitrarily" transferring special education students to general education schools and campuses. Moreover, the Independent Monitor's acknowledgement that LAUSD had again failed to meet Outcome 7 was nothing new. LAUSD had *never* met any version of Outcome 7; this prolonged failure is what led to numerous renegotiations of that Outcome.

In short, only the district court's finding that Appellants variously received some form of notice in April, May, or June of 2013 is reasonably supported by the record. Even so, as discussed above, Appellants had not been privy to the negotiations that led to Renegotiated Outcome 7, and the initial information promulgated by LAUSD as to the practical effects of Renegotiated Outcome 7 was incomplete. Appellants therefore convincingly urge that they did not realize until the August 5, 2013 meeting with Class Counsel that their interests were not being adequately represented by the existing parties to the *Chanda Smith* Litigation. The district court even conceded that this "could constitute a proper explanation for [Appellants'] delay—at least until August 5, 2013." We have no reason to disturb the court's finding in this regard.

However, the district court then proceeded to find no valid excuse for Appellants' additional delays of 71 and 79 days, respectively, between the August 5, 2013 meeting and the October 15 and 23, 2013 filing dates of the motions to intervene. We again reject the district court's analysis as contrary to law and an abuse of discretion in light of the record in this case. Where—as here—both the first and second timeliness factors weigh in favor of intervention, we have found motions to be timely even in the face of *longer* delays than are present here.[22]  *See, e.g.*, *State of Oregon*, 745 F.2d at 552.

---

[22] The off-point and non-binding authorities cited by the district court do not counsel otherwise; those cases merely found unexcused delays of four and five months, respectively, to weigh against a finding of timeliness. *See Key Bank of Puget Sound v. Alaskan Harvester*, 738 F. Supp. 398, 405 (W.D. Wash. 1989); *Consolidated Edison Co. of N.Y. v. Breznay*, 683 F. Supp. 832, 836 (D.D.C. 1987).

More importantly, the totality of the circumstances here demonstrates that Appellants' delay in filing between August and October of 2013 was justified. It bears noting, first of all, that only one Appellant (Munoz) appears to have been present at the August 2013 meetings. And in any event, the record is replete with evidence that—perhaps in no small part due to the rosy language in which the changes were portrayed by LAUSD—Appellants reasonably did not appreciate the full import of Renegotiated Outcome 7, including the changes to their children's curricula and learning environments, until classes actually began in August of 2013, *see, e.g.*, Moreno Decl. ¶ 3; J. Flores Decl. ¶¶ 9, 11; Buschini Decl. ¶ 8; Aguilar Decl. ¶ 4; Pineda Decl. (explaining that Pineda did not realize the safety risk the new learning environment posed to Pineda's autistic son, V.P., until V.P. was found "walking alone a mile from the school" due to understaffing in V.P.'s classroom and the lack of special safety features at V.P.'s new general education campus), or until their children began coming home from school with injuries, *see, e.g.*, J. Flores Decl. ¶ 11, Exh. C (photographs of injuries); A. Flores Decl. ¶ 6; Hernandez Decl. ¶¶ 3–4, Exh. E (photographs of injuries); Chamu Decl. ¶ 6. Many parents initially attempted informal resolution of their disagreement with LAUSD as to their child's placement. *See, e.g.*, Chamu Decl. ¶¶ 6, 10; J. Flores Decl. ¶ 10; Buschini Decl. ¶ 13. Several parents attended a meeting on September 9, 2013, at which they inquired about the new placement of their children. Even after it became clear that intervention was necessary to protect Appellants' interests, it simply took time to organize and gather evidence to support Appellants' motions to intervene. Appellants are not a sophisticated or unified body, but rather a consortium of parents of special education students. *See Stallworth*, 558 F.2d at 264 (explaining that the "size and sophistication of the would-be intervenor"—in that case, the NAACP—

was a relevant factor in determining timeliness). At least one Appellant required translation services to prepare the declaration submitted in support of one of the motions to intervene. *See* Chamu Decl., Translator's Declaration. Taken together, the district court's conclusion that Appellants had offered no valid excuse or explanation for their delay was contrary to the record and clearly erroneous. The district court therefore committed legal error in failing to find that the third timeliness factor weighs in favor of intervention.

Notwithstanding our holding today, we emphasize that this factor cannot be distilled into a bright-line rule. That is, a delay of 71 or 79 days might, under different circumstances, weigh against timeliness. We merely hold today that, in light of all the circumstances presented here, the district court abused its discretion in failing to recognize that Appellants have justified their failure to move to intervene prior to mid-October 2013.

Because all three factors weigh in favor of timeliness, Appellants have established the first element for intervention as a matter of right.

## C. Protectable Interest

Second, Appellants must show that they have a protectable interest in the *Chanda Smith* Litigation. LAUSD does not challenge the district court's finding that Appellants have a protectable interest in receiving a free appropriate public education in conformity with their children's IEPs. *See* 20 U.S.C. § 1412(a)(1)(A); Cal. Ed. Code § 5600, *et seq.* We agree that this is a protectable interest and find the second element for Rule 24(a) intervention to be established.

## D.  Practical Impairment

Third, Appellants must show that they are so situated that the disposition of the action without Appellants may as a practical matter impair or impede their ability to safeguard their protectable interest.  As an alternative basis for denying Appellants' motion to intervene, the district court found that Appellants would "not suffer a practical impairment of their interest in receiving a FAPE in accordance with their IEPs because the adoption of [Renegotiated] Outcome 7 does not deprive [Appellants] of special education centers as placement options or violate the IEP assessment process." As a preliminary matter, we note that this statement is at least partly contradicted by the record: A number of LAUSD's former special education centers are no longer accepting enrollment of Appellants' children and similarly situated disabled students ages 6 to 18.

More to the point, the district court reasoned that denying intervention would not practically impair Appellants' protectable interest, given the availability of individual, administrative due process proceedings for parents who disagree with LAUSD's placement of their child.  *See* Cal. Ed. Code § 56501, *et seq.*[23]  We review the district court's finding of no practical impairment to the putative class

---

[23] Notably, the MCD "preclu[des] . . . any class member [from] bringing any class action claim . . . concerning the District's compliance with IDEA or . . . concerning the provision of a free appropriate public school education."  The MCD carves out a few exceptions, including for administrative proceedings "to review the District's compliance with its obligation to provide a free appropriate public education to any *individual student*." (emphasis added).  However, as members of the *Chanda Smith* class, Appellants are precluded by the MCD from bringing a separate class action challenging the legality of Renegotiated Outcome 7.

action intervenors because of the availability of individual remedies *de novo*, *FFRF*, 644 F.3d at 840, and conclude that the district court erred.

Courts have long recognized the benefits conferred by the class action mechanism over numerous individual actions. Class actions are used to "vindicate[e] . . . the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Particularly where, as here, injunctive relief is sought, "[e]conomic reality dictates" that many challenges to LAUSD's placement of disabled children must "proceed as a class action or not at all." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974). In fact, a determination that the class action vehicle provides a superior mechanism for litigating LAUSD's district-wide policies regarding the education of its disabled student population was already made at the commencement of the *Chanda Smith* Litigation—itself a class action. The denial of intervention here permits the *Chanda Smith* plaintiffs to pursue their education policy goals with the benefit of the class action mechanism, while denying Appellants the same. This result *does*—as a practical matter—impair Appellants' ability to safeguard the interests of a sub-class of LAUSD students seeking retention of special education centers as placement options vis-à-vis Class Counsel's and LAUSD's interest in eliminating them. The impairment is especially perverse given that Appellants currently have children enrolled in LAUSD, while the named *Chanda Smith* plaintiffs' children have long since left.

Not only are individual administrative challenges a comparatively inefficient and ineffective means of achieving

system-wide relief,**[24]** but the administrative proceedings permit Appellants to challenge only the *effects* of Renegotiated Outcome 7 on individual students—not the legality of Renegotiated Outcome 7 itself. *See* Cal. Educ. Code § 56501 (due process hearings are available to resolve disagreements as to the proper placement of an individual child). A collateral challenge on Renegotiated Outcome 7 is an inferior means of protecting the interests of LAUSD's special education center population. Even if Appellants and every single special education student transferred to a general education campus pursuant to Renegotiated Outcome 7 to date were able successfully to challenge that placement through the administrative process, *and* even to secure a court order requiring LAUSD to reopen each child's special education center, Renegotiated Outcome 7 would still mandate a 33 percent reduction in the opportunity for enrollment in special education centers. Thus, it would still require LAUSD to identify and transfer 33 percent of the special education center student population to general education schools, in effect creating a revolving door of transfers between special and general education campuses.

Of course, it is unlikely that all parents will undertake the time and monetary investment necessary to challenge LAUSD's placement of their child. But that fact, again, leads us to conclude that the interests of the sub-class Appellants seek to represent would be practically impaired if intervention is denied and parents of special education students are limited to individual challenges to LAUSD's placement of their children. We accordingly hold that

---

**[24]** Practical considerations, including the allocation of limited resources such as teachers and curriculum materials, also favor direct intervention in the litigation that has led to the adoption of an allegedly unlawful policy, rather than piecemeal efforts to avoid its effects.

Appellants' interest in ensuring the availability of special education centers to LAUSD students (to the extent consistent with IEP and FAPE requirements) would, *as a practical matter*, be impaired if intervention is denied and Appellants are precluded from directly challenging the legality of Renegotiated Outcome 7 in the *Chanda Smith* Litigation. To the extent there is any doubt as to Appellants' establishment of this factor, our resolution of it in favor of intervention is consistent with the rule that "the requirements for intervention are [to be] broadly interpreted in favor of intervention." *Alisal Water Corp.*, 370 F.3d at 919.

## E. Inadequate Representation

There is no dispute that Appellants' interests are inadequately represented by the parties to this action: The current parties' interest in transferring students and resources from special education centers to general education campuses is diametrically opposed to Appellants' interest in retaining the system that was in place prior to Renegotiated Outcome 7. We have no difficulty finding this element met. *Cf. Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (noting that the fourth element of Rule 24(a) intervention requires only a "minimal" showing that existing parties' representation "may be" inadequate).

## III.

In sum, Appellants have established all four elements of intervention as of right under Rule 24(a).

We accordingly **REVERSE** the district court's denial of Appellants' motion to intervene and **REMAND** for further proceedings consistent with this opinion.