FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WESTERN WATERSHEDS PROJECT;
CENTER FOR BIOLOGICAL DIVERSITY,
*Plaintiffs-Appellees*,

v.

DEB HAALAND, Secretary of Interior;
BUREAU OF LAND MANAGEMENT, an
agency of the United States,
*Defendants*,

STATE OF WYOMING; WESTERN
ENERGY ALLIANCE,
*Intervenor-Defendants*,

v.

CHESAPEAKE EXPLORATION, L.L.C.,
*Movant-Appellant*.

No. 20-35780

D.C. No.
1:18-cv-00187-
REB

OPINION

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Magistrate Judge, Presiding

Argued and Submitted September 28, 2021
Seattle, Washington

Filed January 5, 2022

Before:  Ronald M. Gould, Richard R. Clifton, and Eric D.
Miller, Circuit Judges.

Opinion by Judge Clifton

## SUMMARY[*]

### Intervention

The panel reversed the district court's order denying Chesapeake Exploration, LLC's motion to intervene as of right in an action brought by plaintiff environmental groups alleging that the federal government unlawfully issued oil and gas leases on federal land, and remanded with instructions to the district court to enter an order granting the motion.

On May 12, 2020, the district court stayed vacatur of the lease sales pending appeal.  Chesapeake is an independent producer of oil and natural gas, and two weeks after issuance of the stay, it moved to intervene as a defendant in the case. In its motion for intervention, Chesapeake noted that it had already spent more than $19.7 million to acquire, explore, and develop the leases.  In "Phase One," the district court considered plaintiffs' challenges to certain specific lease sales.  The district court first denied Chesapeake's request to intervene for purposes of the Phase One appeal in a July 2020 order, and then denied Chesapeake's request to

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

intervene in subsequent phases of the litigation in a separate August 2020 order.

The panel held that Chesapeake was entitled to intervention as of right under Fed. R. Civ. P. 24(a). Chesapeake has a significantly protectable interest that could be impaired by the disposition of this action, its intervention motion was timely, and its interests will not be adequately represented by existing parties.

Addressing the element of timeliness, the panel considered three factors: the stage of the proceedings at which the applicant sought to intervene; the prejudice to other parties; and the reason for and length of the delay. Concerning the stage of proceedings, the panel held that Chesapeake's participation in the Phase One appeal did not implicate its potential participation in subsequent phases of the litigation, and vice versa. Because Chesapeake's request to intervene in Phase One of the appeal was analytically distinct from its request to participate in a subsequent phase, the district court should have treated the former request as timely filed within the time for the filing of the appeal, which it indisputably was. Accordingly, the stage of the proceedings at which Chesapeake sought to participate supported the conclusion that its request was timely. In addition, the district court did not convincingly explain why Chesapeake's interest in an entirely new phase of the litigation was not warranted. Concerning prejudice to the parties, the panel held with respect to Chesapeake's attempted intervention in Phase One, the prejudice identified by the district court boiled down to the likelihood that additional parties and arguments might make resolution of the case more difficult. This was a poor reason to deny intervention. The district court gave the same inadequate rationale when addressing Chesapeake's request to intervene

in a subsequent phase.  Concerning the reason for and length of delay, the panel held that the district court erred to the extent it measured the length of Chesapeake's delay by reference to events pre-dating the time at which it was reasonably on notice that its interests were not being adequately represented.  Although Chesapeake moved to intervene over two years after the start of this litigation, its motion came just three months after it discovered that its leases were involved in this litigation, and just over two weeks after the district court stayed vacatur of the Phase One lease sales.  The panel concluded under the totality of the circumstances that the district court abused its discretion in finding that Chesapeake's motion for intervention was untimely.

Addressing the element of adequacy of representation, the panel held that Chesapeake made sufficiently colorable arguments that intervenor Western Energy Alliance would not make all of Chesapeake's proposed arguments. Chesapeake identified three such arguments:  execution of a lease constituted a "subsequent ministerial act," rather than a final agency action, and therefore not subject to challenge under the National Environmental Policy Act and the Administrative Procedure Act; the plaintiffs, as third parties, did not have the right to seek vacatur of a contract between the United States (as lessor) and Chesapeake (as lessee); and the district court could not vacate Chesapeake's leases without following applicable procedures under the Mineral Leasing Act and relevant regulations.

The panel concluded that Chesapeake satisfied the requirements for intervention as of right, and the district court's denial of intervention was error.

**COUNSEL**

William E. Sparks (argued), Beatty & Wozniak, P.C., Denver, Colorado, for Movant-Appellant Chesapeake Exploration, L.L.C.

Andrew R. Missel (argued), Sarah Stellberg, and Laurence ("Laird") J. Lucas, Advocates for the West, Boise, Idaho, for Plaintiffs-Appellees.

**OPINION**

CLIFTON, Circuit Judge:

Western Watersheds Project and the Center for Biological Diversity brought this action against the Bureau of Land Management and the Secretary of the Interior, alleging that Defendants unlawfully issued oil and gas leases on federal land. Chesapeake Exploration, L.L.C. ("Chesapeake"), an independent producer of oil and natural gas, moved to intervene as a defendant in the case, but the District Court denied the motion.

The merits of the underlying dispute are not before us. They are the subject of a separate appeal from other orders of the District Court pending before a different panel of this court. We are concerned in this opinion only with the denial of Chesapeake's motion to intervene.

We conclude that Chesapeake was entitled to intervention as of right under Rule 24(a) of the Federal Rules of Civil Procedure. Chesapeake has a significantly protectable interest that could be impaired by the disposition of this action, its intervention motion was timely, and its

interests will not be adequately represented by existing parties.  We reverse and remand.

# I.  Background

## A.  The Bureau's Issuance of Oil and Gas Leases

The Bureau of Land Management (the "Bureau") is an agency within the U.S. Department of the Interior charged with stewarding federal land and its resources to "meet the present and future needs of the American people."  43 U.S.C. § 1702(c).  Although the Bureau meets this obligation in part by leasing federal land for oil and gas development, *see* 30 U.S.C. § 226(a), it must also "take[] into account the long-term needs of future generations," which include "watershed, wildlife," and "natural scenic, scientific and historical values," 43 U.S.C. § 1702(c).   The tension between these competing priorities provides the background for the underlying litigation.

The events underlying this dispute began over a decade ago.  In 2010, the Bureau issued Instruction Memorandum ("IM") 2010-117, a policy that required the Bureau to conduct additional planning and analysis before issuing leases on certain public lands, including those that contain fisheries and wildlife habitats.  This additional analysis was to be led by an "interdisciplinary team" that engaged with "the public and other stakeholders" who were potentially affected by the Bureau's leasing decisions.

Also in 2010, the U.S. Fish and Wildlife Service ("FWS") concluded that the greater sage-grouse, a bird species found throughout parts of the American West, warranted protection under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*  *See* Endangered & Threatened Wildlife and Plants; 12-Month Finding on a Petition to List

Greater Sage-Grouse (*Centrocercus urophasiasnus*) as an Endangered or Threatened Species, 75 Fed. Reg. 13,910, 13,986–88 (March 23, 2010). In 2015, after a multi-year planning process, the Bureau and the U.S. Forest Service amended or revised 98 "Resource Management Plans" to protect sage-grouse habitats across various Western states (the "2015 Sage-Grouse Plans"). Endangered & Threatened Wildlife and Plants; 12-Month Finding on a Petition to List Greater Sage-Grouse (*Centrocercus urophasiasnus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858-01, 59,874, 59,935–36 (Oct. 2, 2015). These plans required the Bureau to prioritize oil and gas leasing outside sage-grouse habitats, *id.* at 59,876, and, in early 2016, the Bureau issued IM 2016-143 to guide enforcement of this prioritization requirement.

After the 2016 presidential election, however, the federal government's land-use priorities shifted. Under the new administration, the Bureau accelerated oil and gas leasing, including on land that contained ecologically significant habitats identified in the 2015 Sage-Grouse Plans. Of relevance here, the Bureau conducted an auction of oil and gas leases in Wyoming in March 2018. Chesapeake, the would-be intervenor in this case, was the high bidder on five leases sold at this auction, for which the company paid over $5.2 million. At another Wyoming auction held in September 2018, Chesapeake paid over $3.2 million for two additional leases. Chesapeake then began drilling wells on its leases under the relevant state and federal permits.

## B. Plaintiffs Challenge Leases on Sage-Grouse Habitats

Plaintiffs-Appellees Western Watersheds Project and the Center for Biological Diversity are non-profit organizations that seek to preserve public lands, natural resources, and ecosystems across the American West. In April 2018,

Plaintiffs sued the Bureau to challenge its issuance of oil and gas leases on sage-grouse habitats identified in the 2015 Sage-Grouse Plans. They also alleged that the Bureau and Interior Secretary (collectively, the "Federal Defendants") had improperly adopted several policies that undermined sage-grouse protections established under the previous administration.[1]

In particular, Plaintiffs alleged that IM 2018-026, issued by the Bureau in December 2017 to replace IM 2016-143, "effectively repeal[ed]" the requirement that the Bureau prioritize oil and gas leasing outside sage-grouse habitats. The complaint asserted that the Bureau improperly issued IM 2018-026 without amending or revising its existing Resource Management Plans as required under the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, or the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Plaintiffs also challenged IM 2018-034, a separate instruction memorandum issued by the Bureau in January 2018. According to Plaintiffs, IM 2018-034 "overhauled" the requirements established in IM 2010-117 and directed the Bureau "to accelerate approval of oil and gas leases at the expense of conducting [a] full environmental analysis" or ensuring public involvement in the Bureau's leasing decisions. Plaintiffs alleged that the Bureau issued IM 2018-034 without complying with the requirements of NEPA or the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.* Finally, Plaintiffs alleged that the Bureau had improperly auctioned oil and gas leases on "hundreds of thousands of acres" that were designated for protection in the

---

[1] The Interior Secretary currently named in the caption of this case is not the official Plaintiffs originally sued, nor did she oversee the policies being challenged.

2015 Sage-Grouse Plans without conducting the required "site-specific" environmental reviews.

In terms of relief, Plaintiffs asked the court to declare IM 2018-026 and IM 2018-034 unlawful under the FLPMA, NEPA, and the APA, and to enjoin the Federal Defendants from continuing to implement either policy. Plaintiffs also asked the court to "[r]everse, set aside, hold unlawful, and/or vacate" the Bureau's sale of various oil and gas leases in 2017 and 2018, including the five leases Chesapeake had purchased in March 2018. All told, Plaintiffs challenged over 2,200 leases covering more than 2.39 million acres across multiple states, arguing that the sales of these leases were "individually and cumulatively unlawful under [the] FLPMA, NEPA, their implementing regulations, and the APA."

After Plaintiffs filed their complaint, the Western Energy Alliance ("WEA") moved to intervene as a defendant. *W. Watersheds Project v. Zinke*, No. 18-CV-187, 2018 WL 3997259, at *1 (D. Idaho Aug. 21, 2018). WEA, a regional trade association representing more than 300 member companies in the oil and gas industry (including Chesapeake), argued that its members had considerable financial interests in the challenged leases. *Id.* at *3. The District Court granted WEA's motion along with a similar motion by the State of Wyoming. *Id.* at *4.

In September 2018, the District Court issued a preliminary injunction requiring the Bureau to conduct future lease sales in accordance with the procedures previously outlined in IM 2010-117 until Plaintiffs' claims could be adjudicated on the merits. *W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1212 (D. Idaho 2018). Shortly thereafter, Plaintiffs filed an amended complaint challenging additional oil and gas leases issued throughout

the summer and fall of 2018, including those purchased by Chesapeake at the September 2018 auction. In December 2018, the District Court issued a case management order dividing the litigation into discrete phases based on specific lease sales. In "Phase One," the court agreed to consider Plaintiffs' challenge to IM 2018-034 and a subset of contested lease sales, including the two leases Chesapeake acquired in September 2018. Chesapeake's five leases from the March 2018 auction were to be considered in a subsequent phase of the litigation.

Finally, on February 27, 2020, the District Court entered partial summary judgment in Plaintiffs' favor with respect to the Phase One claims. *See W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1049 (D. Idaho 2020). The court held, in relevant part, that IM 2018-034 was improperly promulgated without notice-and-comment rulemaking in violation of the APA and FLPMA; that it improperly constrained public participation in the Bureau's leasing decisions in violation of the FLPMA and NEPA; and that the policy's issuance was arbitrary and capricious under the APA. *See id.* at 1049, 1059–75. Having found that IM 2018-034 improperly restricted public involvement in the Phase One lease sales, *id.* at 1075–82, the court vacated these sales, *id.* at 1086–89, including Chesapeake's two leases from the September 2018 auction. The court explained that although the "disruptive consequences" of vacating the Phase One lease sales were "undeniably significant," so were the "deficiencies" in the sales themselves. *Id.* at 1087. Thus, the court concluded that "vacatur . . . [would] avoid harm to the environment and further the purposes of NEPA and FLPMA." *Id.* at 1088.

The court stayed vacatur of the lease sales pending appeal, on May 12, 2020, explaining that although the leases

were "not [yet] to be undone," neither was there to be any "further work developing . . . or obtaining production from [them] . . . pending appeal." *W. Watersheds Project v. Zinke*, No. 18-CV-187, 2020 WL 2462817, at *5 (D. Idaho May 12, 2020). Despite this moratorium on development and production, footnote six of the court's order acknowledged "that some work, to include ordinary maintenance and repair, may be necessary to preserve the status quo at locations where leasehold development is already underway." *Id.* at *5 n.6. Thus, under the so-called "Footnote Six Protocol," the court said it would "consider motions from any party requesting additional detail as to what work, if any," would be permitted "to maintain the suspended status quo" during the Phase One appeal. *Id.*

## C. Chesapeake Moves to Intervene

A little over two weeks after the District Court issued its stay, Chesapeake moved to intervene for purposes of appealing the Phase One decision and participating in any subsequent phase in which its remaining leases were to be considered. In its motion for intervention, Chesapeake noted that it had already spent more than $19.7 million to acquire, explore, and develop the leases. If forced to halt production on these leases, it explained, the company could sustain "irreparable financial harm." In addition to outlining its financial and real property interests in the litigation (and explaining why those interests would be impaired without intervention), Chesapeake argued that its interests were not adequately represented by the Federal Defendants or WEA, neither of whom shared the company's "specific economic interests derived from . . . real property interests." Chesapeake also maintained that its request for intervention was timely. In a declaration accompanying its motion (the "Cryer Declaration"), Chesapeake's land manager, K.W.

Cryer, attested that the company had only "discovered that its leases were involved in th[e] litigation when the [District] Court issued its" February 2020 order vacating two of Chesapeake's leases.  Finally, Chesapeake argued that the litigation was still in its infancy, and that Plaintiffs, who opted to challenge over 2,200 leases in a single lawsuit, would not be prejudiced by intervention.

The District Court took a different view of the matter.  In a decision and order issued July 24, 2020, the court denied Chesapeake's motion to intervene in the Phase One appeal and denied a similar motion by another oil and gas producer. The court first concluded that Chesapeake was not a required party under Rule 19 of the Federal Rules of Civil Procedure because its interests were adequately represented by an existing party to the suit, namely WEA.  Both Chesapeake and WEA, the court reasoned, "share the same ultimate objective in this lawsuit," that is, "upholding the validity of the contested lease sales and avoiding lease vacatur."  Thus, adjudicating the dispute in Chesapeake's absence would not "impair or impede" its ability to safeguard its interests.

The court also concluded that Chesapeake was not entitled to intervene as of right under Rule 24(a).  This conclusion rested not only on the court's finding that WEA adequately represented Chesapeake's interests, but also its finding that Chesapeake's application for intervention was untimely.  According to the court, Chesapeake's attempted intervention was untimely for three reasons: First, Phase One was nearly complete; second, Chesapeake's involvement would introduce new arguments and issues on appeal, thus prejudicing Plaintiffs; and third, Chesapeake had supposedly "[been] aware of the lawsuit" and Plaintiffs' effort to vacate the Phase One leases "from the date [the case] was filed and as the case developed," and thus, any proffered reasons for

delay were unpersuasive. Finally, because "the timeliness element is analyzed even more strictly" in the context of permissive intervention under Rule 24(b) than it is in the context of intervention as of right, the court concluded that Chesapeake's application for permissive intervention also failed.

The District Court's July 2020 order pertained only to whether Chesapeake could intervene to participate in the Phase One appeal; it did not address whether Chesapeake could participate in subsequent phases of the litigation. When the court took up the latter question in a separate decision issued on August 17, 2020, it again concluded the answer was no. In its decision, most of which was copied verbatim from its July 2020 order, the court held that Chesapeake was not a necessary party under Rule 19 and was not entitled to intervene under Rule 24(a) or (b) for the same reasons set forth in the prior order. The court also declined to allow Chesapeake to intervene even for the limited purpose of seeking relief under the Footnote Six Protocol, noting that WEA would be permitted to request such relief "on [Chesapeake's] behalf . . . where appropriate and necessary." This appeal followed.

## II. Discussion

"We have jurisdiction to review the denial of intervention as of right as a final decision under 28 U.S.C. § 1291." *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 950 (9th Cir. 2009) (quotation marks omitted). Our review is de novo, though we review the timeliness element for abuse of discretion. *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 853 (9th Cir. 2016).

Under Rule 24(a)(2), a nonparty is entitled to intervention as of right when it "(i) timely moves to

intervene; (ii) has a significantly protectable interest related to the subject of the action; (iii) may have that interest impaired by the disposition of the action; and (iv) will not be adequately represented by existing parties." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020).[2]  Although the applicant seeking intervention bears the burden of showing that these four elements are met, we interpret these requirements broadly in favor of intervention. *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). "In addition to mandating broad construction, our review is guided primarily by practical considerations, not technical distinctions." *Id.* (citation omitted).

Plaintiffs do not dispute that Chesapeake satisfies the second and third elements of the four-part test above. Instead, they maintain that Chesapeake has failed to demonstrate the timeliness of its application and the inadequacy of WEA's representation.  We address each element in turn.

### A. Timeliness

"A party must intervene when he knows or has reason to know that his interests might be adversely affected by the outcome of litigation." *United States v. Alisal Water Corp.*, 370 F.3d 915, 923 (9th Cir. 2004) (citation and quotation marks omitted).   To determine whether a motion for

---

[2] Rule 24(a) provides that, "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(1)–(2).

intervention as of right is timely, we consider the totality of circumstances facing the would-be intervenor, with a focus on three primary factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Smith*, 830 F.3d at 854.   When evaluating these factors, courts should be mindful that "the crucial date for assessing the timeliness of a motion to intervene is when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties."   *Id.* (citation and alteration omitted).   For the reasons outlined below, we conclude that the District Court abused its discretion in finding Chesapeake's motion untimely under the totality of circumstances in this case.

### 1.  Stage of the Proceedings

As discussed, the District Court first denied Chesapeake's request to intervene for purposes of the Phase One appeal in a July 2020 order.   It then denied Chesapeake's request to intervene in subsequent phases of the litigation in a separate August 2020 order.

In concluding that Chesapeake should not be allowed to intervene for purposes of the Phase One appeal, the District Court observed that the case had been proceeding for more than two years, during which time the court had permitted other parties to intervene, denied multiple motions to dismiss, transferred part of the case to Wyoming, granted a preliminary injunction, and granted partial summary judgment for Plaintiffs.   Because the court had completed "[m]uch, if not most, of the work on Phase One," it held that the first factor weighed against intervention.

It is true that "delay can strongly weigh against intervention," *Alisal Water*, 370 F.3d at 921, particularly

where "the district court has substantively—and substantially—engaged the issues in th[e] case," *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1303 (9th Cir. 1997).  We have also recognized, however, that "the mere lapse of time, without more, is not necessarily a bar to intervention."  *Alisal Water*, 370 F.3d at 921.  The "general rule is that a post-judgment motion to intervene [for purposes of appeal] is timely if filed within the time allowed for the filing of an appeal."  *United States ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391, 1394 (9th Cir. 1992) (citation and alteration omitted).  Plaintiffs do not dispute that Chesapeake filed its intervention motion within the time to file a notice of appeal from the Phase One decision.  Rather, they contend that the "more lenient" timeliness standard in *McGough* does not apply here, because Chesapeake also seeks to intervene in subsequent phases of the litigation as well.

Plaintiffs' argument relies on *United States v. Washington*, 86 F.3d 1499 (9th Cir. 1996), where the court "decline[d] to apply the timeliness analysis that would apply to an intervention limited to appeal" because the would-be intervenor sought to participate more extensively in future aspects of the litigation, *id.* at 1505.  Although *Washington* bears a facial similarity to this case, it can be distinguished in an important respect.  *Washington* involved a so-called "subproceeding" under the district court's continuing jurisdiction to address unresolved treaty issues between the State of Washington and various Indian tribes.  *See id.* at 1502.  Nearly 20 years after the initial litigation addressing these issues, the United States and 16 Indian tribes brought a subproceeding to determine whether the tribes' claim to certain fishing rights prevailed over a competing claim by the State of Washington.  *Id.*  The district court ruled in favor of the tribes and invited the parties to negotiate an

implementation plan. *Id.* Three months later, an association of non-Indian commercial fishers (who had no part in either the initial litigation or the later subproceeding) moved to intervene. *Id.* Although the association purported to intervene for the limited purpose of appeal and any future subproceedings, its requested intervention was actually broader in scope: It sought to participate "in the negotiation and formation" of the district court's implementation plan and "all proceedings" related to that plan. *Id.* at 1505. Thus, the court declined to treat the motion as one for limited intervention on appeal. *Id.* at 1506.

It is true that Chesapeake, like the fishers' association in *Washington*, seeks to intervene both for purposes of appeal and also to participate in future aspects of the district court litigation. But here, the Phase One appeal involves a discrete set of factual and legal issues whose resolution is procedurally distinct from subsequent phases of the litigation. Because this litigation involves such divisible phases, whether Chesapeake should be permitted to intervene in a new, future stage of the litigation involves a different set of considerations than whether it should be permitted to participate in the Phase One appeal. That was not the case in *Washington*, where the association sought to participate in future aspects of the litigation that stemmed from and were directly related to prior proceedings in which the association had played no role. *See id.* at 1505. Though the association "disingenuous[ly]" suggested that it sought "limited intervention" for purposes of taking an appeal, in reality it sought to position itself as a full participant in negotiating—and *then* potentially appealing—the court's implementation plan. *Id.* Thus, the association's request to participate in future aspects of the litigation could not be analytically severed from its request to participate in an appeal. In that context, it made sense not to apply the "more

lenient" timeliness analysis that would govern a motion seeking limited intervention on appeal.  *See id.*

Here, however, Chesapeake's participation in the Phase One appeal does not implicate its potential participation in subsequent phases of the litigation, and vice versa.  Because Chesapeake's request to intervene in Phase One of the appeal is analytically distinct from its request to participate in a subsequent phase, the District Court should have treated the former request as "timely if filed within the time allowed for the filing of an appeal," *McGough*, 967 F.2d at 1394, which it indisputably was.  Accordingly, the stage of the proceedings at which Chesapeake sought to participate supports the conclusion that its request was timely.

In denying Chesapeake's request to participate in a subsequent phase that would impact its leasehold interests, the District Court repeated the same rationale it had given with respect to the Phase One appeal, noting once more that "[m]uch, if not most, of the work on Phase One is complete for the time being."  But that rationale does not explain why Chesapeake should not be permitted to participate in an entirely new phase of the litigation.  This is not a situation, for example, in which the would-be intervenor seeks to "reopen [years] of litigation." *Smith*, 830 F.3d at 856.  Rather, Chesapeake seeks to intervene at "the commencement of a 'new stage' in the [litigation]." *Id.*; *see also Alisal Water*, 370 F.3d at 921 ("Prior cases suggest that a party's interest in a specific phase of a proceeding may support intervention at that particular stage of the lawsuit.").  Although the District Court observed that Phase Two of the litigation was "underway," Chesapeake is not seeking to intervene in Phase Two, as its remaining leases are now scheduled to be litigated under Phase Four.  In sum, the District Court did not convincingly explain why

Chesapeake's intervention in an entirely new phase of the litigation (which had yet to begin) was not warranted, particularly given the significant financial and property interests at stake.

Although Plaintiffs acknowledge that the beginning of a "new stage" in a case may be the appropriate time for a party to intervene, they cite *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), for the proposition that such reasoning applies only "where the new phase develops as a result of a change in the law or the factual circumstances," not when the new phase arises "in the general progression of the case to a close," *id.* at 777. But Plaintiffs have taken our statement in *Garza* out of context and applied it to facts that are readily distinguishable.

In *Garza*, the plaintiffs filed a voting rights action seeking to redraw districts for the Los Angeles County Board of Supervisors (the "Board"). *Id.* at 765. After a three-month bench trial, the court concluded that the County had violated the Voting Rights Act and ordered it to propose a redistricting plan that would produce a voting district with a Hispanic majority. *Id.* at 767. As the case was unfolding, the Board held a primary election under the existing apportionment plan. *Id.* at 769. A primary candidate forced into a runoff then sought to intervene in the lawsuit to oppose any redistricting plan that would allow additional primary candidates to compete in her race. *Id.* We upheld the district court's denial of intervention, explaining that the would-be intervenor "knew that th[e] lawsuit was pending at the time when she decided to run in the election, and knew that part of the relief sought was a redistricting plan that could affect the outcome of that election." *Id.* at 777. Despite this knowledge, the candidate "did not petition to intervene until four months after she declared her candidacy," which came

nearly two years after the beginning of the case. *Id.* We observed that introducing a new party at such a late stage in the case could produce "irreversible prejudicial delay" in litigation "where time was of the essence." *Id.*

Here, by contrast, there is no evidence that Chesapeake knew about Plaintiffs' lawsuit when it purchased its leases in March 2018 (a month before Plaintiffs even filed suit) or September 2018. *See* pages 22–23 below. If Chesapeake, like the candidate in *Garza*, had known about Plaintiffs' lawsuit and recognized what the requested remedy might entail, the outcome here would likely be different. But in contrast to the would-be intervenor in *Garza*, Chesapeake did not have such knowledge when it acquired its leases. Thus, the new stage in which it seeks to intervene was not "a foreseeable part of a chain of events" to it as it was to the would-be intervenor in *Garza*. *See* 918 F.2d at 777.

## 2. Prejudice to Other Parties

We have observed that the second timeliness factor, prejudice to existing parties, is "the most important consideration in deciding whether a motion for intervention is untimely." *Smith*, 830 F.3d at 857 (citation omitted). Under this factor, the only relevant "prejudice" is "that which flows from a prospective intervenor's failure to intervene after he knew, or reasonably should have known, that his interests were not being adequately represented." *Id.* Stated differently, "prejudice" does not arise merely "from the fact that including another party in the case might make resolution more difficult." *Id.* (citation, alteration, and quotation marks omitted).

Here, with respect to Chesapeake's attempted intervention in the Phase One appeal, the sole prejudice identified by the District Court was the fact that Plaintiffs

would face additional briefing on appeal, including "possible additional arguments not presented to or ruled upon by the [District] Court."  If intervention were allowed, the court reasoned, Plaintiffs may face "redundant arguments" and a "piling on" effect.  But to support this conclusion, the court cited a single district court decision that did not involve an attempt to intervene on appeal.  *See generally Shoshone-Bannock Tribes of Fort Hall Rsrv. v. United States Dep't of Interior*, No. 10-CV-4, 2010 WL 3173108 (D. Idaho Aug. 10, 2010).  Apart from the fact that Chesapeake's request to intervene in the Phase One appeal was filed within the time allowed for filing an appeal, and was therefore timely, *see* pages 16–19 above, the prejudice identified by the District Court boils down to the likelihood that additional parties and arguments might make resolution of this case more difficult.  *See Smith*, 830 F.3d at 857.  That is a poor reason to deny intervention, particularly given the possibility that Chesapeake's additional arguments could prove persuasive.  That Chesapeake might raise new, legitimate arguments is a reason to grant intervention, not deny it.

The District Court gave the same rationale, virtually word-for-word, when addressing Chesapeake's request to intervene in a subsequent phase affecting its leasehold interests and any briefing under the Footnote Six Protocol.  But this rationale carries little if any weight in the context of subsequent phases that had either just begun or had yet to begin.  That is, if Chesapeake were allowed to intervene in Phase Four to defend its remaining leasehold interests, Plaintiffs would not be prejudiced by "possible additional arguments not presented to or ruled upon by the [District] Court," or by a "piling on" effect, for this phase was not underway when the court issued its ruling.  Once again, the prejudice described by the District Court is merely the likelihood that Plaintiffs might have to confront additional

briefing and arguments.  But that is a predictable risk when challenging over 2,200 leases, across vast swathes of the American West, in a single action.  That this litigation may become more tangled and complex with the addition of interested parties is not a basis for denial of intervention.  *See Smith v. L.A. Unified Sch. Dist.*, 830 F.3d at 857.

### 3.  Reason For and Length of Delay

The third timeliness factor considers "the length of, and explanation for, any delay in seeking intervention."  *Smith v. Marsh*, 194 F.3d 1045, 1051–52 (9th Cir. 1999).   In evaluating this factor, courts are to measure the length of an intervenor's delay by reference to the point at which the intervenor knew, or reasonably should have known, that its interests were not being adequately represented by existing parties.  *Smith*, 830 F.3d at 859.

In its July 2020 order denying Chesapeake's request to intervene in the Phase One appeal, the District Court stated that Chesapeake "[was] aware of the lawsuit and that Plaintiffs were seeking to set aside the Phase One leases as part of that litigation, from the date it was filed and as the case developed."  Oddly, however, the court's sole support for this statement was Plaintiffs' initial complaint, their motion for partial summary judgment, and WEA's motion to intervene.  The court did not explain how these documents put Chesapeake on notice, or should have put it on notice, that its interests were not being adequately represented by existing parties.  More problematic is the fact that the court apparently overlooked uncontested record evidence, set forth in the Cryer Declaration, that Chesapeake did not even know "that its leases were involved in this litigation" until the court issued its February 2020 order vacating the sale of

two of Chesapeake's leases.[3]  If the court had some basis to question this representation, it could have conducted further inquiry by, for example, holding an evidentiary hearing or ordering supplemental declarations from relevant company staff.  But there is no evidence in the record that any such inquiry took place, and the court makes no reference to the Cryer Declaration in either of its orders denying intervention.  We are left to conclude, therefore, that the court simply overlooked this evidence.

Similarly, in its order denying Chesapeake's request to intervene in a subsequent phase of the litigation, the District Court stated that Chesapeake, as a member of WEA, was aware of this lawsuit and the fact that Plaintiffs were seeking to vacate its lease sales.  Again, however, the court referred to the same documents cited in its previous order without acknowledging the conflicting evidence set forth in the Cryer Declaration.  The court did not explain how Chesapeake's membership in WEA, which represents more than 300 companies, would necessarily have put the company on notice that its leases were involved in this litigation.

---

[3] Plaintiffs argue that Chesapeake failed to raise this argument before the District Court.  That is not true.  On page 10 of its brief in support of its motion for intervention, Chesapeake stated that it "was not aware until recently that the [District] Court would attempt to vacate and cancel its [l]eases."  In support, Chesapeake cited to paragraph 11 of the Cryer Declaration, which states that Chesapeake had only learned that its leases were involved in the litigation in February 2020.  Although Chesapeake's brief could have been clearer, it is inaccurate to suggest that Chesapeake did not raise an argument regarding its belated knowledge that its leases were involved in this litigation.  Moreover, while parts of Chesapeake's brief might be read to suggest that Chesapeake knew about the litigation generally, Chesapeake did not concede knowing that its leases were involved, as Plaintiffs argue.

Thus, the District Court "erred to the extent it measured the length of [Chesapeake's] delay by reference to events pre-dating the time at which [it was] reasonably on notice that [its] interests were not being adequately represented." *Smith*, 830 F.3d at 859. Although Chesapeake moved to intervene over two years after the start of this litigation, its motion came just three months after it discovered that its leases were involved in this litigation, and just over two weeks after the District Court stayed vacatur of the Phase One lease sales. *Cf. id.* at 859–60 (concluding that intervention motion was timely where the movants sought "to intervene approximately one year after the change in circumstances prompting their motion," but "only weeks after definitively learning that their interests were not adequately represented by the existing parties").

We conclude that under the totality of circumstances, the District Court abused its discretion in finding that Chesapeake's motion for intervention was untimely.

## B. Adequacy of Representation

As discussed, intervention under Rule 24(a) also requires Chesapeake to show that its interests "will not be adequately represented by existing parties." *Oakland Bulk*, 960 F.3d at 620. "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898. To evaluate adequacy of representation, courts consider three factors: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Id.* (citation omitted).

It is true that Chesapeake and WEA share the same "ultimate objective" of upholding the Bureau's lease sales; thus, there is a presumption that WEA adequately represents Chesapeake's interests. *See id.* To rebut this presumption, Chesapeake must make a "compelling showing" of inadequate representation. *Id.* Here, Chesapeake has made this showing by establishing that WEA will not "undoubtedly make all of [the] proposed intervenor's arguments," *id.*, contrary to the District Court's conclusion. Indeed, Chesapeake has identified three arguments that WEA did not raise before the District Court. Chesapeake asserts that the execution of a lease constitutes a "subsequent ministerial act," rather than a final agency action, and therefore is not subject to challenge under NEPA and the APA. Chesapeake also argues that under the relevant federal statutes, Plaintiffs, as third parties, do not have the right to seek vacatur of a contract between the United States (as lessor) and Chesapeake (as lessee). Finally, Chesapeake contends that the District Court cannot vacate its leases without following applicable procedures under the Mineral Leasing Act and relevant Bureau regulations. Although Plaintiffs dismiss these arguments as "meritless," the relevant standard requires merely that an existing party cannot or will not "make any *reasonable* argument" that the intervenor would make if it were a party. *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1180 (9th Cir. 2012) (emphasis added). Thus, we need not determine whether these arguments are likely to prevail. That they are colorable is sufficient at this stage.

Our decision in *United States v. Oregon*, 839 F.2d 635 (9th Cir. 1988), illustrates why Chesapeake has made the compelling showing necessary to warrant intervention as of right. In *Oregon*, the United States had sued the State of Oregon pursuant to the Civil Rights of Institutionalized

Persons Act, 42 U.S.C. § 1997 *et seq.*, alleging that the state had failed to provide "minimally adequate" training, medical care, sanitation, and trained staff to serve the needs of intellectually disabled residents at a long-term care facility. *See id.* at 636. Residents of the facility sought to intervene either as of right, under Rule 24(a), or permissively, under Rule 24(b). *See id.* We reversed the district court's denial of intervention, concluding that the residents were entitled to intervention as of right. *See id.* at 637–39. We explained that although the United States and the residents shared the common "goal of vindicating the [residents'] constitutional rights," it was also "apparent that the government's arguments [would] not include [certain] constitutional deficiencies" which the residents themselves sought to raise. *Id.* at 638. Accordingly, we held that the United States was not adequately representing the specific interests the residents sought to protect. *Id.* So it is here. Although Chesapeake and WEA may share the same ultimate objective in this litigation, Chesapeake has identified several colorable arguments that WEA did not seek to raise in the proceedings below. Indeed, as counsel for Chesapeake observed at oral argument, WEA was given a mere 10 pages in its Phase One merits brief, despite the fact that there were 932 leases at issue. Thus, in addition to our holding in *Oregon*, practical considerations lead us to conclude that WEA cannot adequately represent the more specific "interests [Chesapeake] wish[es] to protect." *Id.*

Finally, as a party with a legally protected interest in contract rights with the federal government, Chesapeake "would offer [a] necessary element[] to the proceeding that other parties would neglect." *Citizens for Balanced Use*, 647 F.3d at 898. Unlike WEA or the State of Wyoming, Chesapeake actually participated in the challenged lease sales and obtained a property interest that is imperiled by this

litigation.  We have observed, in the analogous context of Rule 19, that "a party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract." *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002); *see also Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.").  Although Rule 24, unlike Rule 19, does not require us to determine whether Chesapeake is a necessary or indispensable party, the principle identified in the latter context carries persuasive force here.  Chesapeake, like the would-be intervenor in *Dawavendewa*, has a substantial due process interest in the outcome of this litigation by virtue of its contract with an existing party. *See* 276 F.3d at 1157 (noting that the "litigation threaten[ed] to impair the [would-be intervenor's] contractual interests, and thus, its fundamental economic relationship with [an existing party]").  This due process interest provides a "necessary element[]" that would otherwise be absent from this case. *See Citizens for Balanced Use*, 647 F.3d at 898.

Admittedly, WEA has intervened for the express purpose of representing companies, such as Chesapeake, that have due process interests in the challenged leases.  But WEA is charged with representing over 300 companies "engaged in all aspects" of oil and gas production across the western United States.  Whereas Chesapeake took part in a narrow subset of challenged lease sales and seeks to defend a specific property interest in which it has invested millions of dollars, WEA is obligated to represent the more general interests of the oil and gas industry as a whole.  It is possible that Chesapeake's more narrow interests (and the arguments

it seeks to make), informed by specific regional and investment-related concerns, will differ from those of WEA, which must necessarily take into account a more diffuse set of considerations.  Given its specific financial and property interest, Chesapeake brings a unique perspective to this litigation that existing parties may neglect.  *Cf. Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995) (concluding that intervenors had established inadequacy of representation where the existing defendant was "required to represent a broader view than the more narrow, parochial interests" advanced by the intervenors), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (en banc).

Because Chesapeake has satisfied the requirements for intervention as of right under Rule 24(a), the District Court's denial of intervention was in error.  We need not reach the Parties' remaining arguments under Rule 24(b) or Rule 19.

Costs to be taxed against Plaintiffs-Appellees.

**REVERSED AND REMANDED for further proceedings with instructions to the District Court to enter an order granting the motion for intervention.**